The next case on our docket is 22-30105, Mexican Gulf Fishing Company v. U.S. Dept. of Commerce. Thank you, Your Honor. May it please the Court, John Vecchione with me at Council Tables, co-counsel Sheng Li, New Civil Liberties Alliance, for the appellant class of charter boat captains. The court below erred in four main ways, all of which require reversal of this case. The first is whatever proper Fourth Amendment analysis is, it misread the Fourth Amendment. It then looked, by just assuming that there was a Fourth Amendment violation rather than saying so, it then vastly expanded the closely regulated exception to the warrant requirement in regulation. It then gave the agencies a kind of carte blanche to avoid the really important APA notice and comment so that the public is able to know what the agency is proposing and be able to comment on it and require the agency to then respond to those comments in a meaningful way. And finally, it failed to properly analyze the Fifth Amendment claim, saying that it hadn't been properly pled, and it was properly pled under all pleading standards. And so the first item is the standard. We argued below, and we think the proper standard is that this is a trespassory Fourth Amendment search. The government's position is still that it's not a search, and I don't know how you can get to that position because in the United States v. Richmond, if you touch the tire, this Court said if you touch the tire and to find out if there's something in the tire, that's a search. I have to lay out some of the facts here so that the Court is well aware. They're in the brief, but I don't think you can really understand all the things these charter boat captains have to do. So they don't fish. They take people out recreational fishing who don't have boats. So that's what they're doing. They're not fishing themselves, and this is not commercial. When the regulation first came out, I think it was presumed that one device would do that, but that's not what actually has happened. What happened was there's the VMS requirement that we're challenging in its entirety because it is tracking the boats at all times, even when they're at dock, even when they're not doing anything requiring the permit. We don't think they should be tracked even when they're using the permit, but even when they're not using the permit, they're tracked. So then what else do the charter boat captains do? Well, whenever they leave dock, if I'm here in a cove and I go 500 yards across the cove to fill up my tanks, I have to call the fisheries and tell them that I'm leaving the dock, and whether it's a permit trip or a non-permit trip. Now, they know where I am. They know where my boat is, and I have to say, Mother, may I, when I'm taking my wife out to dinner across the cay. That's what's going on here. So it's not like they don't have any knowledge of this. They also have an app. Now, the app, we have challenged some of the information collected by the app, and some places use, some different fisheries, not the Gulf, use a log book where you log what you took, what you discarded, and then your client, the guy who actually fished, countersigns it. But we're not challenging the app where before you come into dock, you have to say all the fish and all the discards. Sort of the main regulatory reason that NOAA and fisheries and the other appalities get to do this is the fish. The way I always explain it is, if you've ever seen Robin Hood with Errol Flynn and Olivia de Havilland, he doesn't get in trouble because he's a rebel or any of this stuff. He gets in trouble because he's taken the king's deer, right? It's the king's deer and it's the king's fish. So as close as you are to the fish, none of my clients have ever objected to counting the fish or doing any of that environmental analysis that needs to be done to make sure there's the right amount of redfish and red snapper and all of that. What they're complaining about and what I think has to be very well understood is that they're giving all of these agencies a lot of information about what they're doing of what the agency actually needs to know to do its job. And none of that is challenged here. So the second thing, I don't know how you can say it's not a Fourth Amendment search. It is under Jones. It's trespassory. So is this industry closely regulated? And it is not. And I want to say that the district court's opinion only cites commercial fishing. And we do not claim. I've represented commercial fishers. We have not argued that they're not closely regulated because as we say in our brief, there are treaties going back to the Revolutionary War about commercial fishing. Certainly foreign fishing, commercial fishing was a very big deal, but that's because of the amount and the importance of commercial fishing all through history and the history of it. What's going on here, what's happening here is there's a pincer movement. Against Fourth Amendment rights going on if the agencies do this. They regulate and they regulate and they regulate. And then they say if you're closely regulated, you don't get Fourth Amendment rights. And so what's happening is I think even Berger, Berger has an interesting point on the closely regulated issue. We don't believe that when you have a trespassory invasion of Fourth Amendment rights that you can even have a Berger test. We think that's a CATS issue, not a trespassory. But let's say you disagree with me. There, even in Berger, they said, well, this is a new industry. So the closely regulated has to be either from the beginning of time or when the industry started, right? Nuclear power, nuclear power comes into being. And not only, and I always use this example because the federal government created nuclear power. The federal government said who could use nuclear power? Nuclear power was a new thing that's closely regulated. Recreational fishing is everybody. It's everybody who goes out in the Gulf. And you have, you know, you have the amount you can take. The regular fishing regulations we all have. And we all know when we go fishing. So I do think that it's important to realize that what's happening here is a movement to say something that has never been closely regulated and I think until the 90s wasn't regulated at all by the federal government and say, well, no Fourth Amendment warrant requirements for you. Hasn't our circuit said that very, very few things are closely regulated and that we're not going to expand closely regulated on our own if it wasn't already well-established? I think if you look at ZDAH, that's exactly right. And I may be saying the name, it's Z-E-D-E-H. And the fact of the matter is is that those were doctors. And the Fifth Circuit said even, you know, if they prescribe Schedule II drugs, maybe that's closely regulated. But we're not deciding. Well, if the regulation of Schedule II drugs is a maybe, recreational fishing is way, way, way out in the blue and nowhere near. So I don't think you can use that exception at all. So I don't think that the exception is there. And I want to move on. Now, are your complaints not relying on the Texas Constitution's provision to let you fish and hunt? No, it is not, Your Honor, because I will tell you these boats have to go out into the federal waters. So I know I got it. But the states, other than Texas, did put in a brief in this case, and they did, many of the Gulf states did, and South Carolina. What about the Fifth Amendment claim? Did you do that in your amended complaint? Yes. Was that in your First Amendment complaint? Yes. Fifth Amendment? Yes. It was in both of them. But in the Fifth Amendment, in our brief, we cite all the paragraphs. Now, in Iqbal, Trombley, sometimes we shorten it to Twickville. It used to be just a short, plain statement. Well, under that, even under Twickville, this is pled. If you look at Loretto, Loretto is I'm putting a cable box on this. I had looked at Loretto. It's the exact same thing. We laid out the facts of where they want this VMS device, that they want to put it on our property. I mean, we don't have to lay out. We don't have to use the magic word takings, which we did not. I admit that. But we cited the Fifth Amendment, and we said that they're taking part of our boat by putting this VMS device on it. All you have to do to state a claim is to state the facts. You do not have to state the law. And this Court has been clear about that again and again. And so I do think that the Court was wrong not to address those arguments upon summary judgment. What do you seek here today? So we believe that the Court should reverse and say that this is a warrantless search, and it's not allowed, and strike the VMS rule. That's the key thing. The secondary thing is under the app, because they didn't tell us that they wanted basically our most closely guarded business secrets of how much we're charging the customers, how much our gas is costing, all that, we can't get that from the APA notice and comment. We can't get that from the final rules, notice and comment. We weren't given any chance to know that. So we think that should be overruled under the APA. There's not a constitutional claim about that. That's just pure APA. And I will just note we aren't waiving the fact that people, you know, all of these businesses are small businesses. They're all under the RFA and everything. They don't have an army of lawyers out there looking at everything. And when they make a comment, they make a comment based on regular American knowledge of things. And they say, you know, we think this is a Fourth Amendment violation. And the agencies come back, and the agencies say, well, we'll keep the data safe.  You shouldn't be getting the data. So we believe the VMS, the final rule should be overturned in its entirety as unconstitutional. We believe that the parts of the app that collect material that they didn't say they were going to collect, they very clearly said, we want the fish and we want the bycatch. Bycatch is the term of art for things that you don't take. They said that clearly, and we've never challenged it either under the APA or under the Constitution. So that is what we are asking for here. And I also think that there is another problem with this case that I believe the court should address, because I think it is hanging around like Chekhov's gun to go off in the next scene. And that's this. Both the court below and the government have argued that you have to prove that you're not violating the law. In this case, we said, wait a minute, they're following us around. There hasn't even been an administrative finding that our industry is particularly breaking this law or not reporting or not doing all the things they're supposed to do. Because I have found, representing this industry, that they are really worried about getting their permits. The agencies have a lot of power over them because they want to go out on their boats and they want to take people out. So it's not like there's a large, and they're not taking the fish. This isn't even like the commercial industry where maybe they're all trying to get the quotas. It's not that sort of thing. So there's not even an administrative finding that there's a lot of problem here. What the agencies have done here is say that we can always assume that the regulated parties are lawbreakers and doing bad things, and then we can violate their constitutional rights. And in a footnote, the court below actually said, yeah, you haven't shown me anything in the record that you're not lawbreakers. And I don't think you have to do that. As an American, I think that turns the whole law upside down. I specifically think it turns administrative law. It makes administrative law unwieldy for any constitutional right. Because I can see in a case where they found that there was a big problem in the administrative record, it would be a harder case. Here there's none of that. It's just we want to do it. We have the ability to permit you. We can throw you off the ocean. And tough luck, guys. That's it. That's pretty much the analysis. So I think that the court's statement and the government's restatement of it in their briefs, that you have to show that you're not violating the regulations, and that even if you show that, we're still allowed to follow you around, is extremely dangerous. It should not be left unremarked on. To put a device on a car, you have to have at least an informant's tip that there's a drug deal or murder or something going to go down. Don't you still? Yes, you do. And I would say even for the Coast Guard. I found the Williams and Whitmer cases of this court even before the split. I think those were before the split. They said that even the old rule of even for Coast Guard checks, there has to be something. There has to be some kind of reasonable suspicion. Now, as I said before, the Coast Guard, it's old. Alexander Hamilton started it. It's been doing stuff like this a long time. And this court said maybe it doesn't have all the powers it did in Alexander Hamilton's time, but it still allowed wide, wide leeway because you don't know where the boats are coming from. In those cases, they could be bringing drugs from Bimini, I think it was, or they could be coming from Venezuela. They know where our boats are. We've got to tell our customers, you know, show up at this key at such and such an hour, and we'll take you out for five hours, or we'll take you back. It's not a mystery. It's not like we have, you know, wandering. They're not Jean Lafitte going from port to port, you know, doing recreational fishing. Well, but the game wardens in Texas, you know, how many fish did you take? Correct. They'll come look and measure. Correct. And they'll count your quail or your doves or your deer. And they know where we're coming back to dock. They know where we're coming, and they can do that. And we tell them on the app beforehand. So, anyway, I've reserved my time for rebuttal unless there are any further questions. Good morning, Your Honors. May it please the Court. I'm Daniel Helinen from the Department of Justice for the United States. I'd like to begin this morning by talking about Congress. Congress, of course, has a long history of regulating fishing vessels that are operating in federal waters. And in the Magnuson-Stevens Act, Congress has directed the National Marine Fisheries Service to use that authority to conserve and manage the nation's fisheries for the benefit of everyone, including the fishing industry, which relies on the reliability and stability of the nation's fishing stocks. And I think the choices that Congress has made in the Magnuson-Stevens Act answer a lot of the key questions for the Court today about the statutory question, of course, but also about the Fourth Amendment question. Specifically, Congress, of course, has expressly authorized the National Marine Fisheries Service to require fishing vessels who come to the service to get permits, as these vessels have done, to use specified equipment and devices that can be used to facilitate enforcement. And Congress has also pervasively regulated this industry through the Magnuson-Stevens Act and expressly included commercial vessels and charter vessels. I'd like to elaborate a little bit on those two points, but before getting more into that, I think it would be helpful to discuss a little more generally how these electronic reporting regulations carry forward this task that Congress has charged the agency with. What jurisdiction has ever recognized recreational fishing as a closely regulated industry? We don't have a case for that, Your Honor. We would submit to the Court that this is not recreational fishing. Congress has made a judgment to separate out charter fishing from recreational fishing, and charter fishing is distinct because these are vessels that are carrying paying passengers into federal waters. It's not commercial fishing. If you want to put charter fishing in the in-between state, then I will ask the same question. What Court has ever said charter fishing is a closely regulated industry? We agree Congress separated commercial fishing from charter fishing. We don't have a case where a court has looked at charter fishing in particular, but we think that's not necessarily dispositive of any of these questions because Congress has developed this pervasive regulatory scheme that includes both commercial fishing and charter fishing. And the way that the courts have looked historically at these types of industries does not support an approach that would allow plaintiffs who have particular circumstances that don't align with sort of the general previously established basis for establishing an administrative inspection regime to carve out their particular circumstances in a way that would undermine the regulatory scheme that Congress itself has established. The purposes of the Magnuson-Stevens Act and the policies that Congress has written directly into the statute, this is in Section 1801 of Title 16, talk about overfishing generally. And Congress has tied that purpose and policy to both commercial fishing and charter fishing. And if you look at provisions of the statute, like, for example, Section 1853A5, that is one of the provisions that details what the agency should be putting into fishery management plans and the regulations that implement that. So you're saying that charter fishing can be regulated just the same as commercial fishing? I think that's not what we're saying, Your Honor, because Congress specifically categorized them differently, right? And that's why we have a regulation here that applies specifically to charter fishing permit holders. Okay. Assuming arguendo that the relevant industry is the charter boat fishing industry and that there is such an industry as opposed to recreational, shouldn't we remand to the district court to consider whether the regulation complies with the Fourth Amendment since that analysis hasn't been done yet? In a charter fishing-specific way? Yes. Is that Your Honor's question? I don't think the court needs to do that because the justification under the Fourth Amendment would look to the same factors that the court addressed in looking at the fishing industry as a whole. And, of course, regardless of what the district court said, this court, I think, should also look at the industry as a whole, including both commercial and charter fishing, and look to the same reasons that the court has identified. And, of course, the other courts that we've pointed to in our briefing, the Third Circuit has a detailed decision on this, the Ninth Circuit. These courts have all looked at fishing generally, and we think it's appropriate to include Those are commercial fishing, not fishing in general. Yes, those are commercial fishing. So it's not fishing in general. That's not true. I take your point, Your Honor. And I guess Were there findings of fact by Congress regarding charter fishing that underpinned this statute? So in the findings in Section 1801, the Congress spoke to charter fishing, excuse me, Congress spoke to overfishing generally as an issue. I'm talking about charter fishing. Right. This is a problem or could be a problem, or is it charter fishing? So the findings that Congress made about overfishing are not specifically tied to commercial versus charter versus recreational fishing in that fashion. The policy generally is about the impact that fishing has on the nation's fishing stocks, and that is affected both by commercial fishing Well, are there numbers? Did Congress look at numbers to see how many fish charter fishing pluck out of the oceans? We don't have a finding that I can point to right now, Your Honor, in Section 1801 along those lines. But I think the general purpose that Congress was looking at was, you know, maintaining the stability and health of the nation's fishing stocks and to regulate one part of the industry that's affecting that, but not another, I think, would not be a sensible approach for Congress to take. Because of the reasons that Congress laid out, this is an industry where fishing, you know, by any party could have an effect on the health of the stock and resulting overfishing that's detrimental and what Congress said was potentially an irreversible way. So let's take it that it's a problem, and let's take it that the electronic reporting requirements for fishing activity are okay and required or appropriate. What conceivable justification is there for the GPS tracking requirement? So the justification that the agency has identified in the rule is a need for independent verification of the information that counsel was talking about from trip declarations and log books and things like that. And what is the evidence that the trip declarations and log books are inaccurate, such that you need to validate them with a GPS tracker that applies 24-7, whether they're taking their families to dinner or they're going across the cove to get gas? So I can answer that in two ways, Your Honor. So the first is that I think the agency acknowledged in the rule itself, it hasn't previously had this independent means of verifying information. The agency did conduct things like surveys, headboat surveys, et cetera, to gather data, to look at things like fishing effort and ensure it had accurate and reliable information about those statistics that it tracks. And so what the agency did here is, because it was adopting this more general program of electronic reporting to improve the reliability and accuracy, this means of independently verifying this otherwise electronically submitted information, the agency determined that was the best way to ensure that it is getting accurate and reliable information. So adopt the solution first and figure out if it's a problem second? So I don't think, Your Honor, it's unusual for agencies to adopt inspection regimes to ensure compliance. You know, this is getting to the Fourth Amendment question, but you look at something like New York against Berger, that is a case about inspections of junkyards to ensure that they're complying with rules about maintaining junkyards. And I think that's a normal feature of how agencies go about ensuring compliance. And I think the agency made a judgment that this particular rule was the best means of accomplishing its goal of ensuring independent verification to improve the reliability and accuracy. But constant tracking is very different than periodic inspection. That's so different. It's a big leap. I think, Your Honor, I want to make sure that we're clear about what is actually going on. This is a once hourly ping of a GPS location that is conveyed, you know, sometimes archived and submitted if it's a cellular alert, but, you know, conveyed directly to the agency through a satellite program. And this information is simply being used to verify that the vessel is on a fishing trip. And, you know, I think another way to look at this is, you know, counsel was talking about calling the agency to report information. If the agency had adopted a regulation that, you know, as an alternative to this, required vessels to call every hour to verify that they're still on a fishing trip, I don't think it would necessarily raise the same concerns. The issue is that, you know, they're objecting to the automatic conveying of that information. Yes, to constantly be monitored is, I think, what's being objected to. That's constant monitoring of your every move is frightening to most by the government, is frightening to most people. I understand Your Honor's concern, but I think one thing that I would emphasize as a context for this program is that, you know, this is a permit program. This is a privilege to, you know, take advantage of the fishing stocks that Congress has charged the agency with conserving in this way. And, you know, this is not something that would be applicable to all species, right? This is just for federally managed species. It's only in federal waters. So it is a part of a regulatory regime that, as we've detailed, and I don't think is sort of controversial. This is, you know, a complex, for good reason, type of regulation. What's not controversial? That this type of regulation of the nation's fisheries through things like the Fishery Management Councils and Fishery Management Plans, whereby the agency develops these regulatory programs that are tailored to specific needs of particular fisheries, particular species, particular regions. But what's been shown that this is actually tailored? What documents or evidence shows that this was necessary? We don't have information on how much of these fish are being fish overfished or hurt. We don't have information that the logs are not working the normal way. We haven't done any of the homework that would justify this extreme measure, even if you could justify the extreme measure. Have we? What homework was done on that? I think my colleagues have both asked about those things. I understand the Court's concern and the question, Your Honor. I think I would point to a few different things here. One is that this is a type of program that has support within the industry. It came up through the Fishery Management Councils. What difference does that make at all? I think because the point is that there's concerns within the industry, and the amicus brief has pointed to some of these at parts of the record, like 10661 and 10665, about things like illegal fishing within the nation's fisheries, and this fishery in particular. And to the Court's question about has the agency done its homework, I think the point of this regulation is so that the agency can ensure that it is getting accurate information. They make the argument in their briefs about necessary and appropriate. That's the language in the Act. And it's usually when agencies move into rulemaking, they do make background. They say, you know, we need this information. We can't get it another way. We have problems with the charter fishing industry. They're pulling X tons of fish from these areas every year. They make some findings, and then that supports one way or the other, whether it's necessary and appropriate under the Act to implement these kinds of regulations. Yes, Your Honor. So as just a preliminary answer to Your Honor's question, we think the necessary and appropriate provisions of Section 1853 are an independent basis for looking at the statutory question here. We think the Court can resolve the statutory question solely on 1853b-4, which is the provision about equipment and things like that. And we think in terms of the substance of what the agency was looking at as to why this regulation was appropriate, the agency, of course, did go through the Fishery Management Council process. It didn't say whatever equipment or devices the agency could dream up. That's correct, Your Honor. It said to further the ends of the Act. Yes, Your Honor. That's to me the nexus that's missing here. The agency didn't say, well, without these devices, we cannot carry out the purposes of the Act. So as applied to charter fishing, it's commercial fishing. That's a whole other ballgame. Yes, Your Honor. I understand. I think I would point to a couple things. So first, in terms of what the agency was thinking in developing this regulation, which, again, came up through the Fishery Management Council. It did not originate with the Secretary. If you look in places of the record, like 11758, 12094, we have record evidence about some of the proceedings that were going on below where the agency looked at things like surveys, like the headboat survey that the agency discusses in the background to this, and discussed why that couldn't be scaled up as a means of providing verification. And this was the only way to provide that type of independent verification that the agency was looking at. And so there isn't an alternative that the agency could identify in the record of achieving this goal of independent verification. This was a cost-effective way of providing that information through a VMS unit, which, as we've discussed, is common in the industry and is used for other purposes in other fisheries, has been used in commercial fisheries. Again, I acknowledge that it's a different type of part of the industry, but has been used in commercial industries for different purposes. So this is not some wholly new type of device that is unfamiliar to the industry. I'm glad you brought up cost-effective. To the Chief's point about findings of fact that agencies often do in their final rules,  that the so-called startup costs associated with this rule would be $150 to $800 and some odd dollars per vessel, presumably for purchasing the equipment required by the agency. Where in the final rule can I find where the agency considered the costs to the regulated industry of their privacy? Where did the agency say, look, this is so important to us, and we are so concerned in the need of independent verification that it's going to outweigh the needs of boat owners, charter company operators, and captains to tell the federal government where they are 24 hours a day, seven days a week, 365 days a year? I can't find it. I think what I would point the court to is in the responses to comments at page 44010. This is volume 85 in the rule. This is where the agency discussed comments about privacy concerns, and the agency explained its view of that question about why it was appropriate in this context. And help me understand what the answer is. I mean, if you're telling us that we don't know what the problem is, that this is a solution in search of a problem, because we have no reason to believe on this administrative record that there's a problem that necessitates this solution, but we understand very concretely what the costs are, both in terms of real dollars for purchasing equipment, and that's a whole other question about where is the authority to require them to purchase this stuff. But how can you weigh actual costs to the petitioners against a benefit that you can't explain to us because the administrative record says we have no evidence to think we actually need this data? I think the answer to that, Your Honor, is just that the agency has expressed its view of the benefits of these regulations as providing independent verification. I don't want to belabor the point because I know I've already provided the court with this answer, but that is the agency's view. So there's nothing specific to answer Judge Oldham's question? There's nothing specific? I think there are specific places in the record where the agency discusses the benefits, but they're the ones that I've been discussing already, so I don't want to belabor the point. Okay. So do you take the position that this is not a search? And if you – I mean, how do you deal with Carpenter, for example, that members of the public have a privacy interest in the whole of their physical movements? Your Honor, I think we would, again, as we said in our brief, urge the court to look at whether it's reasonable without addressing the question of whether it's a search, as the district court did. But in response to Your Honor's question, we think that the distinction here, the reason the agency doesn't view this as a search, is because it is a requirement to comply with a permit condition where the vessel itself is installing the unit, goes out and buys it itself, and is conveying information to you. Because it's forced to by the government. It is a condition of their permit, yes, Your Honor. I understand the court's concern there, but I think it is distinct from a case like Jones or Carpenter where you have an investigative purpose. This is a regulatory compliance measure that is conveying just an hourly ping of location data to the government about the types of information that the agency is already getting submitted to it through things like logbooks and trip declarations. This is the type of information that the vessels are already providing. This is just independent verification. Could it require everybody who has a phone and operates a vessel, well, everybody to have a phone, and require the phone to have a GPS tracking? Most phones have this already anyway. But they give the government access and the serial number so that they can constantly do that of any phone that any charter vessel owner or lessor has. Your Honor, I don't know what the conservation and management purpose of that would be. So they can double-check where the person is and check where the boat is. It's just as related to the fishing as the constant GPS of the boat when you're going to dinner on the boat. So this GPS, the VMS unit, is tied to the vessel itself. It is not tied to a specific— Well, the requirement would be you only have to turn it on when you're on the boat. But you still—I assume that in her hypothetical. For a personal cell phone to convey that information, I don't think— I can't think of a reason why the agency would need that information when it is looking at things like a fishing effort. The requirement we have here is tied specifically to the vessel to look at when the vessel is taking a trip. Because it makes—maybe thinks you're giving the vessel to somebody else. And those people are the evildoers. I still don't think I can understand a conservation and management purpose that would be tied to the statute that Congress enacted. So any time the government is doing a good thing, they can require GPS devices if they have a necessary— even without any findings. Like, could you do that to vehicles that have transport baby formula? Because baby formula is such a precious commodity. Could they say everybody, every manufacturer and every grocery store company? Because we want to make sure you're not diverting any of it to the black market because it's more precious than gold. We don't yet have any findings that it's being diverted to the black market. We don't know that just requiring you to tell where it's gone and the destination on a little form doesn't work. But could they make everybody put little devices on all their trucks? No, Your Honor. Why not? I think that there's a couple of distinctions from the case that we have here. One, this is a pervasively regulated industry, and that is why the government has a sort of different regulatory role in this function because of the unique nature. Isn't that kind of circular in that we haven't yet established that it's a pervasively regulated industry? I think, Your Honor, that, again, I don't want to belabor points that we've already been discussing, but it is not contested, I think, that fishing generally, in some form, and I understand the distinction that counsel is drawing with commercial fishing, but that the federal government has a unique role in regulating fishing vessels in federal waters. Was there a two? I didn't mean to cut you off from answering the original hypo. I think I've lost my train of thought, Your Honor. I apologize. I see my time is up, so unless the court has further questions. Thank you, counsel. Thank you. Thank you. Recreational fishers who aren't on charter boats take far more fish in the Gulf than charter boat fishermen do. You say that. What do you have to back that up? So in our brief, what we have done is we've taken the numbers from the website that NOAA keeps on its website of what the commercial take is, what the recreational take is, and then we extrapolate by how much we take, all right? So we don't have the exact numbers, but percentage-wise, more people go out to fish on their own boats. They turn on the oven roof, and they go out somewhere in the Gulf and fish. And what is happening here, and this is why I've used the pincer movement, what's happening here is that if fishing is recreational fishing, and the MSA, the Magnuson-Stevens Act, doesn't help them because the Magnuson-Stevens Act makes a difference. Well, the Supreme Court's made clear that you don't have to regulate everything that might be a problem to regulate one thing, which leads to my next question. What's your best case that says what's the limit on a government's requirements that they can place on a permit holder? Okay. I think that the case that's best here is LeBron, which is cited in our reply brief. We have three cases there, but I think the LeBron case at 710 F. 3rd 1202, it's out of the 11th Circuit, but these were welfare benefits, okay? And the question was whether you could have people take a drug test. It was a search case. And because the welfare benefits were so intrinsically to their livelihood, I think it is, just like these permits are for my guy's livelihood, that I think that these unconstitutional condition cases, because the agencies are always going to say that, oh, you want a permit, you know?  You don't need to be free of unwarrantless searches if you have a permit. It's not really what they've said. Well, give me a case outside welfare benefits. Okay. I have some in the reply, Your Honor, but I don't have it. That you're going to stand on? On LeBron, yeah. I think those are good, and the other two cases in my reply brief. So I do want to say that the recreational fishing, the other thing is on the Patel test. Recreational fishing isn't dangerous. I think that for all the cases for a closely regulated industry, dangerousness is important. Now, I've gone recreational fishing. My wife has said, don't waste your time, but she's never said, be careful. It's not dangerous. Well, but, you know, I'm not sure Patel applies to commercial fishery either, but that's, you know. It is closely regulated, though, and hotels. I thought your point was you don't have closely regulated industries unless there's some dangerous aspect to it. Yes. And I'm saying I'm not sure that's true with respect to commercial fisheries is my point. It is to recreational fishing. This is not the most dangerous catch. I'm just talking about commercial fisheries, and that clearly you can regulate commercial fisheries. I agree, Your Honor. That's my point. Yes. But recreational you can, and I think they're bootstrapping it. They're bootstrapping one industry that has been long regulated for good reason, because you drop a net, you clear the ocean. This is not that case. So then I also want to point out that Magnuson Stevens, I take a look at 16 U.S.C. 1801A.13, if my eyes do not deceive me, and that is where they make the distinction between commercial and recreational, and these fish are not sold to anyone. You fillet them, you take them home, that's it. They're not going into the market anywhere, and that is it. I think Buckeye makes the analogy that these guys are Uber drivers. They're not doing the fishing or the moving of stuff themselves. And also necessary and appropriate. No matter what happens, I think it's bad to say that necessary and appropriate ever applies to redundancy, particularly when a constitutional right is at issue. Here there is redundancy. They don't trust you. And since the agency don't trust you, some of my clients say, well, you know, a criminal gets an ankle bracelet with more due process than I'm getting for them to follow around, follow me around. Well, necessary and appropriate doesn't help that, especially when it's redundant. I don't think any finding could say, you know, we'd really like to belt and suspenders this. The reason we use the term belt and suspenders is because that's not necessary. That's overcautious or overregulating. So I never think necessary and appropriate counts. Well, I would argue with you on electrical generation and power. Right. And nuclear power, dangerousness, Your Honor. Well, right. Electricity generation is not dangerous either. I'm just saying we can't carry these characterizations to the extreme. I understand, Your Honor. And the last one I want to say is about the devices. I think the devices have to be not a tracking device but devices used in fishing. They could not require us to have a harpoon on our boat because some commercial vessel needs a harpoon. All right. Thank you, counsel. We've got your item. Thank you.